# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,
      Plaintiff,

v.                                   CASE #: 16-20715-CR-COOKE

CRAIG SIZER,
      Defendant.
_____/

## PETITION BY MARIA SIZER

## (THIRD PARTY CLAIMANT)

COMES NOW, the Petitioner, MARIA SIZER ("Petitioner"), by and through the undersigned attorney, and asserts a third-party interest in real property located at 555 N.E. 57th Street, Miami, Florida, 33137, pursuant to *21 U.S.C. §853(n)*, which has been preliminarily ordered forfeited to the Government in the instant case. In support thereof, Petitioner states as follows:

## FACTUAL BACKGROUND

1.     In March 2008, CRAIG SIZER ("Sizer"), the Defendant in the above styled case, purchased real property located at 555 N.E. 57th Street, Miami, Florida, 33137 (the "Subject Property"). Ex. 1 (Purchase Paperwork)

2.     The agreed sales price of the Subject Property was $1,025,000.00. *Id.*

3.     To execute the purchase, Sizer paid 20% of the sales price from his own funds as a down payment and obtained a mortgage for the remaining 80%. *Id.*

4.     Thus, Sizer paid $205,000.00 (two hundred and five thousand dollars) from his own funds and mortgaged $820,000.00.

5.      In April 2008, Sizer also paid $56,051.00 to complete renovations that increased the value of the Subject Property. Ex. 2 (Construction Invoice)

6.      On August 7, 2009, Sizer married Petitioner in Miami-Dade County, Florida. Ex. 3 (Marriage Record)

7.      Following their marriage, the Subject Property functioned as Sizer and Petitioner's family home and residence.

8.      Petitioner continues to reside in the Subject Property with the couple's two minor children.

9.      From September 2009 through approximately December 2015, Sizer engaged in the illegal conduct that is the subject of the above styled case. Ex. 4 (Factual Proffer)

10.     Upon information and belief, Sizer began to profit from his illegal conduct around March 2010 and used a portion of those proceeds to pay the mortgage on the Subject Property.

11.     However, it should be noted that Sizer made interest only payments on the mortgage and did not acquire any equity therefrom.

12.     On September 1, 2015, Sizer quit claimed the Subject Property to Petitioner because he was advised that spousal joinder was needed to maintain the homestead status of the property. Ex. 5 (Quit Claim Deed and Emails).

13.     At the time of the quit claim, Petitioner did not know or have reason to know of Sizer's illegal conduct giving rise to forfeiture.

14.     Petitioner was a bona fide purchaser for value of the right, title, and interest in the Subject property who, at the time of the quit claim, was reasonably without cause to believe that the Subject Property was subject to forfeiture.

15.     It should be noted that Petitioner was not charged in the instant case and had absolutely no involvement in or knowledge of Sizer's illegal conduct.

16.     While Sizer engaged in the illegal conduct that is the subject of the instant criminal prosecution, Petitioner functioned as a housewife, cared for their children, and maintained their home.

17.     Petitioner is not a sophisticated litigant. Her education is limited to high school equivalency which was attained in her native country of Venezuela. Petitioner speaks broken English as a second language and has no professional experience, education, training, or licensing in finance, accounting, business, or securities.

18.     On the contrary, prior to marrying Sizer, Petitioner worked as a flight attendant for a Venezuelan airline.

19.     On February 23, 2017, Sizer plead guilty to one count of *Conspiracy to Commit Mail and Wire Fraud* in violation of *18 U.S.C. §1349*.

20.     Pursuant to Paragraph 13 of his plea agreement, Sizer agreed to forfeiture of the Subject Property. Ex. 6 (Plea Agreement)

## VALUATION OF THE SUBJECT PROPERTY

21.     It should be recalled that Sizer bought the Subject Property in March 2008 for $1,025,000.00.

22.     To make this purchase, he paid $205,000.00 as an initial down payment.

23.     He also paid for $56,051.00 in renovations which increases the property the value of the property.

24.     In total, Sizer paid $261,051.00 out of his pocket to buy the Subject Property and increase its value prior to the illegal conduct triggering forfeiture of the Subject Property.

25.     Because Sizer made interest only payments on the mortgage, he did not have any other equity in the Subject Property beyond his down payment and property improvements.

26.     Pursuant to their marriage and the quit claim deed, Petitioner has a fifty percent (50%) interest in that equity.

## SPECIFIC PROPERTY CLAIMED BY PETITIONER

27.     Petitioner claims fifty percent (50%) of the equity in the Subject Property.

28.     It should be noted that Petitioner's claim does _not_ include any equity derived from mortgage payments made by Sizer using the proceeds of his illegal conduct because all of his mortgage payments were interest only payments. No equity was derived from any of his mortgage payments.

29.     It also does not include the portion of equity that Sizer agreed to forfeit pursuant to his plea agreement. On the contrary, Petitioner is claiming her half only.

30.     According to a market study performed by the undersigned's realtor, the Subject Property is expected to have a present market value between $1,300,000 and $1,400,000. Ex. 7 (Market Study)

31.     The outstanding mortgage balance is currently $820,000.00 plus $1,374.50 for an advance. Ex. 8 (Mortgage Statement)

32.     Thus, the total balance owed the mortgage company is $821,374.50.

33.     Therefore, Petitioner's 50% interest in the Subject Property's equity is expected to have a present market value between $239,312.75 and $289,312.75.

**RELIEF SOUGHT**

34.     This Court is first asked to conduct a hearing to adjudicate the validity of Petitioner's interest in the Subject Property.

35.     The Court is further asked to amend its preliminary order of forfeiture and its ultimate final order of forfeiture to reflect that 50% of the equity in the Subject Property rightfully belongs to Petitioner and shall not be forfeited to the Government.

36.     It should be noted that the Subject Property is located in the "Morningside" neighborhood of Miami, Florida and has substantially increase in value since its purchase nearly ten years ago.

37.     The Court is also asked to vacate the existing *lis pendens* and order the sale of the Subject Property and order the proceeds of such sale be split as follows: 50% of the equity to be paid to Petitioner and the balance to be paid to the Government or the Government and any other claimant as appropriate.

38.     To that end, the Court is asked to permit Petitioner ninety (90) days to obtain a contract for the sale of the Subject Property before permitting the Government to place property for public sale (because public sale by the Government is expected to result in a *substantially* lower sales price).

39.     Upon sale of the Subject Property, the Court is also asked to apportion the costs of the sale proportionately amongst the parties according to their interest in the property, to be paid from the gross proceeds of the sale.

40.     Other relief that the Court deems equitable, just, and appropriate.

**DEMAND FOR ATTORNEYS FEES AND COSTS**

41.     Petitioner demands attorney's fees and costs where appropriate.

## <u>OATH UNDER PENALTY OF PERJURY</u>

I declare under penalty of perjury, under the laws of the United States of America, that all

of the foregoing is true and correct.

Signed,

_____

**Maria Sizer**
Petitioner

Dated: <u>09</u> / <u>22</u> / <u>2017</u>

Respectfully Submitted,

**Law Offices of Brian Silber, P.A.**
*Attorneys for Petitioner Maria Sizer*

12 S.E. 7th Street, Suite 705
Fort Lauderdale, Florida 33301
954-462-3636 (office)
954-627-0809 (fax)
SilberLaw@gmail.com

By:      /s/ *Brian Silber*_____
         BRIAN SILBER, ESQ.
         Florida Bar #: 0640646
         Member SDFL


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing instrument was e-filed with the Clerk

of Court using CM/ECF on September 25, 2017.

By:      /s/ *Brian Silber*_____
         BRIAN SILBER, ESQ.
         Florida Bar #: 0640646
         Member SDFL

## SERVICE LIST

**VIA CM/ECF and U.S. Mail:**

**Michelle B. Alvarez, Esq.**
Assistant United States Attorney
c/o U.S. Attorney's Office, SDFL
99 N.E. 4th Street, Suite 700
Miami, Florida, 33132
305-961-9088
305-536-4089 (Fax)
Michelle.Alvarez@usdoj.gov

# Exhibit 1
## (Purchase Paperwork)



# OFFICE OF THE PROPERTY APPRAISER

## Detailed Report

Generated On : 9/20/2017



| Property Information | |
|---|---|
| Folio: | 01-3218-036-0500 |
| Property Address: | 555 NE 57 ST<br>Miami, FL 33137-2626 |
| Owner | CRAIG V SIZER<br>MARIA SIZER |
| Mailing Address | 555 NE 57 ST<br>MIAMI, FL 33317 USA |
| PA Primary Zone | 0100 SINGLE FAMILY - GENERAL |
| Primary Land Use | 0101 RESIDENTIAL - SINGLE<br>FAMILY : 1 UNIT |
| Beds / Baths / Half | 3 / 2 / 0 |
| Floors | 2 |
| Living Units | 1 |
| Actual Area | 3,638 Sq.Ft |
| Living Area | 3,462 Sq.Ft |
| Adjusted Area | 3,136 Sq.Ft |
| Lot Size | 6,480 Sq.Ft |
| Year Built | 1940 |

| Assessment Information | | | |
|---|---|---|---|
| Year | 2017 | 2016 | 2015 |
| Land Value | $411,532 | $391,935 | $314,089 |
| Building Value | $353,678 | $32,919 | $33,074 |
| XF Value | $43,064 | $43,552 | $28,807 |
| Market Value | $808,274 | $468,406 | $375,970 |
| Assessed Value | $707,465 | $378,601 | $375,970 |

| Benefits Information | | | | |
|---|---|---|---|---|
| Benefit | Type | 2017 | 2016 | 2015 |
| Save Our Homes Cap | Assessment Reduction | $100,809 | $89,805 | |
| Homestead | Exemption | $25,000 | $25,000 | $25,000 |
| Second Homestead | Exemption | $25,000 | $25,000 | $25,000 |

| Taxable Value Information | | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **County** | | | |
| Exemption Value | $50,000 | $50,000 | $50,000 |
| Taxable Value | $657,465 | $328,601 | $325,970 |
| **School Board** | | | |
| Exemption Value | $25,000 | $25,000 | $25,000 |
| Taxable Value | $682,465 | $353,601 | $350,970 |
| **City** | | | |
| Exemption Value | $50,000 | $50,000 | $50,000 |
| Taxable Value | $657,465 | $328,601 | $325,970 |
| **Regional** | | | |
| Exemption Value | $50,000 | $50,000 | $50,000 |
| Taxable Value | $657,465 | $328,601 | $325,970 |

Note: Not all benefits are applicable to all Taxable Values (i.e. County, School Board, City, Regional).

The Office of the Property Appraiser is continually editing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser

# OFFICE OF THE PROPERTY APPRAISER

Generated On : 9/20/2017

**Property Information**

**Folio:** 01-3218-036-0500

**Property Address:**   555 NE 57 ST

# Roll Year **2017** Land, Building and Extra-Feature Details

| Land Information | | | | | |
|---|---|---|---|---|---|
| Land Use | Muni Zone | PA Zone | Unit Type | Units | Calc Value |
| GENERAL | T3 R | 0100 | Front Ft. | 60.00 | $411,532 |

| Building Information | | | | | | |
|---|---|---|---|---|---|---|
| Building Number | Sub Area | Year Built | Actual Sq.Ft. | Living Sq.Ft. | Adj Sq.Ft. | Calc Value |
| 1 | 1 | 1940 | 2,285 | 2,109 | 1,971 | $223,511 |
| 1 | 2 | 2004 | 660 | 660 | 532 | $63,202 |
| 1 | 3 | 2016 | 453 | 453 | 393 | $53,055 |
| 2 | 1 | 1940 | 240 | 240 | 240 | $13,910 |

| Extra Features | | | |
|---|---|---|---|
| Description | Year Built | Units | Calc Value |
| Aluminum Modular Fence | 2004 | 153 | $4,682 |
| Patio - Brick, Tile, Flagstone | 2004 | 856 | $8,286 |
| Pool 6' res BETTER 3-8' dpth, tile 250-649 sf | 2004 | 1 | $26,400 |
| Whirlpool - Attached to Pool (whirlpool area only) | 2004 | 30 | $3,696 |

The Office of the Property Appraiser is continually editing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser and Miami-Dade County assumes no liability, see full disclaimer and User Agreement at http://www.miamidade.gov/info/disclaimer.asp

Version:

# OFFICE OF THE PROPERTY APPRAISER

Generated On : 9/20/2017

**Property Information**

**Folio:** 01-3218-036-0500

**Property Address:** 555 NE 57 ST

## Roll Year **2016** Land, Building and Extra-Feature Details

| Land Information | | | | | |
|---|---|---|---|---|---|
| Land Use | Muni Zone | PA Zone | Unit Type | Units | Calc Value |
| GENERAL | T3 R | 0100 | Front Ft. | 60.00 | $391,935 |

| Building Information | | | | | |
|---|---|---|---|---|---|
| Building Number | Sub Area | Year Built | Actual Sq.Ft. | Living Sq.Ft. | Adj Sq.Ft. | Calc Value |
| 1 | 1 | 1940 | 2,285 | 1,959 | 1,946 | $15,763 |
| 1 | 2 | 2004 | 660 | 660 | 532 | $6,392 |
| 1 | 3 | 9999 | 453 | 453 | 393 | $0 |
| 2 | 1 | 1940 | 240 | 0 | 240 | $10,764 |

| Extra Features | | | |
|---|---|---|---|
| Description | Year Built | Units | Calc Value |
| Whirlpool - Attached to Pool (whirlpool area only) | 2004 | 30 | $3,738 |
| Patio - Brick, Tile, Flagstone | 2004 | 856 | $8,380 |
| Aluminum Modular Fence | 2004 | 153 | $4,734 |
| Pool 6' res BETTER 3-8' dpth, tile 250-649 sf | 2004 | 1 | $26,700 |

The Office of the Property Appraiser is continually editing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser and Miami-Dade County assumes no liability, see full disclaimer and User Agreement at http://www.miamidade.gov/info/disclaimer.asp

Version:

# OFFICE OF THE PROPERTY APPRAISER

Generated On : 9/20/2017

**Property Information**

**Folio:** 01-3218-036-0500

**Property Address:**   555 NE 57 ST Miami, FL  33137-2626

## Roll Year **2015** Land, Building and Extra-Feature Details

| Land Information | | | | | |
|---|---|---|---|---|---|
| Land Use | Muni Zone | PA Zone | Unit Type | Units | Calc Value |
| GENERAL | T3 R | 0100 | Front Ft. | 60.00 | $314,089 |

| Building Information | | | | | |
|---|---|---|---|---|---|
| Building Number | Sub Area | Year Built | Actual Sq.Ft. | Living Sq.Ft. | Adj Sq.Ft. | Calc Value |
| 1 | 1 | 1940 | 2,285 | 1,959 | 1,946 | $15,763 |
| 1 | 2 | 2004 | 660 | 660 | 532 | $6,464 |
| 1 | 3 | 9999 | 453 | 453 | 393 | $0 |
| 2 | 1 | 1940 | 240 | 0 | 240 | $10,847 |

| Extra Features | | | |
|---|---|---|---|
| Description | Year Built | Units | Calc Value |
| Aluminum Modular Fence | 2004 | 153 | $3,519 |
| Patio - Brick, Tile, Flagstone | 2004 | 856 | $6,163 |
| Pool 6' res BETTER 3-8' dpth, tile 250-649 sf | 2004 | 1 | $17,100 |
| Whirlpool - Attached to Pool (whirlpool area only) | 2004 | 30 | $2,025 |

The Office of the Property Appraiser is continually editing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser and Miami-Dade County assumes no liability, see full disclaimer and User Agreement at http://www.miamidade.gov/info/disclaimer.asp

Version:

9/20/2017

Case 1:16-cr-20715-MGC   Document 341   Entered on FLSD Docket 09/25/2017   Page 14 of 81
Property Search Application - Miami-Dade County

# OFFICE OF THE PROPERTY APPRAISER

Generated On : 9/20/2017

**Property Information**

**Folio:** 01-3218-036-0500

**Property Address:**   555 NE 57 ST

| Full Legal Description |
|---|
| 18 53 42 |
| BAYSHORE UNIT NO 2 PB 9-98 |
| LOT 13 BLK 17 |
| LOT SIZE 60.000 X 108 |
| OR 17912-4908 1297 1 |
| COC 26262-4936 03 2008 1 |

| Sales Information | | | |
|---|---|---|---|
| Previous Sale | Price | OR Book-Page | Qualification Description |
| 09/01/2015 | $410,000 | 29838-4554 | Corrective, tax or QCD; min consideration |
| 03/01/2008 | $1,025,000 | 26262-4936 | Sales which are qualified |
| 04/01/2006 | $0 | 24499-1120 | Sales which are disqualified as a result of examination of the deed |
| 03/01/2005 | $930,000 | 23175-4330 | Sales which are qualified |
| 12/01/1997 | $180,000 | 17912-4908 | Sales which are qualified |

The Office of the Property Appraiser is continually editing and updating the tax roll. This website may not reflect the most current information on record. The Property Appraiser and Miami-Dade County assumes no liability, see full disclaimer and User Agreement at http://www.miamidade.gov/info/disclaimer.asp

Version:

Return To: LOAN # 6210833171
FL9-700-01-01
JACKSONVILLE POST CLOSING
BANK OF AMERICA
9000 SOUTHSIDE BLVD.
BLDG 700, FILE RECEIPT DEPT.
JACKSONVILLE, FL 32256
This document was prepared by:
   TIFFANY L BRAVERMAN
   BANK OF AMERICA
   21000 NW EVERGREEN PKWY
   HILLSBORO, OR 971247121

CFN  2008R0204680
OR Bk 26262 Pgs 4938 - 4959; (22pgs)
RECORDED 03/12/2008 14:09:28
MTG DOC TAX 2,870.00
INTANG TAX 1,640.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

─────────── [Space Above This Line For Recording Data] ───────────

# MORTGAGE

LOAN # 6210833171

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated MARCH 07, 2008 , together with all Riders to this document.
**(B) "Borrower"** is CRAIG V SIZER, A SINGLE MAN

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is BANK OF AMERICA, N.A.

Lender is a NATIONAL BANKING ASSOCIATION
organized and existing under the laws of THE UNITED STATES OF AMERICA

**FLORIDA** – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          **Form 3010 1/01**

-6(FL) (0005)
Page 1 of 16          Initials:
VMP MORTGAGE FORMS - (800)521-7291

CVFL 02/25/08 1:09 PM 6210833171

Lender's address is 21000 NW EVERGREEN PKWY, HILLSBORO, OR 971247121

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated   MARCH 07, 2008                .
The Note states that Borrower owes Lender EIGHT HUNDRED TWENTY THOUSAND AND 00/100
                                                                                                    Dollars
(U.S. $        820,000.00 ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than       APRIL 01, 2038                .
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights
in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _____

VMP®-6(FL) (0005)                                    Page 2 of 16                                    Form 3010 1/01
        CVFL 02/25/08 1:09 PM 6210833171

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the COUNTY                                          of    MIAMI-DADE                                          :
     [Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]

Lot 13, Block 17, of BAYSHORE UNIT #2, according
to the Plat thereof, as recorded in Plat Book 9, Page 98,
of the Public Records of Miami-Dade County, Florida.

Parcel ID Number: 0132180360500                    which currently has the address of
555 NORTHEAST 57TH STREET                                                          [Street]
MIAMI                                                             [City], Florida 33137      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials: _____

-6(FL) (0005)                                    Page 3 of 18                                    Form 3010 1/01
CVFL 02/25/08 1:09 PM 6210833171

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be

applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Initials: _____

-6(FL) (0005)                          Page 5 of 16                          Form 3010 1/01
CVFL 02/25/08 1:09 PM 6210833171

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of

the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the

Initials: _____

—6(FL) (0005)          Page 7 of 16                                      Form 3010 1/01

CVFL 02/25/08 1:09 PM 6210833171

date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate

<table>
<tr><td>⬛₂-B(FL) (0005)</td><td>Page 8 of 16</td><td>Initials: <em>CM</em></td><td>Form 3010 1/01</td></tr>
</table>

CVFL 02/25/08 1:09 PM 6210833171

from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any

Initials: _____

other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the

Initials

Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security

Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums

Initials ___

which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Initials: _CW_

-6(FL) (0005)                                    Page 13 of 16                              Form 3010 1/01
CVFL 02/25/08 1:09 PM 6210833171

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

Initials

-6(FL) (0005)                                   Page 14 of 16                          Form 3010 1/01
      CVFL 02/25/08 1:09 PM 6210833171

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____                    _____ (Seal)
WITNESS PRINTED NAME AND SIGNATURE                           CRAIG V SIZER                         -Borrower

                                                             555 NORTHEAST 57TH STREET , MIAMI , FL , 33137
                                                                                                   (Address)

Carl L Crawford
WITNESS PRINTED NAME AND SIGNATURE                           _____ (Seal)
                                                                                                   -Borrower

                                                             _____
                                                                                                   (Address)

Liron Offir (Seal)                                           _____ (Seal)
Witness -Borrower                                                                                  -Borrower

(Address)                                                    (Address)

_____ (Seal)                      _____ (Seal)
                                  -Borrower                                                        -Borrower

(Address)                                                    (Address)

_____ (Seal)                      _____ (Seal)
                                  -Borrower                                                        -Borrower

(Address)                                                    (Address)

VMP-6(FL) (0005)                       Page 15 of 16                        Form 3010 1/01
                                       CVFL 02/25/08 1:09 PM 6210833171

STATE OF FLORIDA,  Miami Dade  County ss:
The foregoing instrument was acknowledged before me this 7th day of March 2008
by  Craig V. Sizer

who is personally known to me or who has produced F L . Dr License as identification.



Notary Public

PHILIP STEVEN GOLDIN
Commission DD 681441
Expires July 6, 2011
Bonded Thru Troy Fain Insurance 800-385-7019

Initials: _____

Page 16 of 16       Form 3010 1/01
CVFL 02/25/08 1:09 PM 6210833171

─6(FL) (0005)

LOAN # 6210833171

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this   7TH   day of   MARCH,  2008         ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note")
to BANK OF AMERICA, N.A.

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at: 555 NORTHEAST 57TH STREET, MIAMI, FL  33137

(Property Address)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES IN THE
INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN
THE INTEREST RATE WILL RESULT IN LOWER PAYMENTS.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in
the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of        5.310         %. The Note
provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
   The interest rate I will pay may change on the  FIRST  day of  APRIL,  2013
      , and on that day every      12TH       month thereafter. Each date on which my
interest rate could change is called a "Change Date."

   **(B) The Index**
   Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is:

**MULTISTATE ADJUSTABLE RATE RIDER − Single Family**   MGNR 02/25/08 1:09 PM 6210833171
Page 1 of 6
**BS899R (0402)**      VMP Mortgage Solutions, Inc. (800)521−7291

THE ONE-YEAR LONDON INTERBANK OFFERED RATE ("LIBOR") WHICH IS THE AVERAGE OF INTERBANK OFFERED RATES FOR ONE-YEAR U.S. DOLLAR-DENOMINATED DEPOSITS IN THE LONDON MARKET, AS PUBLISHED IN THE WALL STREET JOURNAL.  THE MOST RECENT INDEX FIGURE AVAILABLE AS OF THE DATE 45 DAYS BEFORE EACH CHANGE DATE IS CALLED THE "CURRENT INDEX."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-QUARTER                                    percentage points (    2.250     %) to the Current Index. The Note Holder will then round the result of this addition to the ☐ Nearest ☒ Next Highest ☐ Next Lowest ONE-EIGHTH OF ONE PERCENTAGE POINT        (     0.125     %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

☒ **Interest-Only Period**
The "Interest-only Period" is the period from the date of this Note through APRIL 01 , 2018     . For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

The "Amortization Period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**BS899R (0402)**                    Page 2 of 6              MGNR 02/25/08 1:09 PM 6210833171

**(D) Limits on Interest Rate Changes**
**( Please check appropriate boxes; if no box is checked, there will be no maximum limit on changes .)**

☐ (1) There will be no maximum limit on interest rate changes.

☐ (2) The interest rate I am required to pay at the first Change Date will not be greater than                              % or less than                    %.

☐ (3) My interest rate will never be increased or decreased on any single Change Date by more than                        percentage points (                              %) from the rate of interest I have been paying for the preceding period.

☒ (4) My interest rate will never be greater than 10.310                      %, which is called the "Maximum Rate."

☐ (5) My interest rate will never be less than                              %, which is called the "Minimum Rate."

☐ (6) My interest rate will never be less than the initial interest rate.

☒ (7) The interest rate I am required to pay at the first Change Date will not be greater than        10.310        % or less than        2.250        %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  TWO
percentage points (        2.000        %) from the rate of interest I have been paying for the preceding period.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

BS899R (0402)                    Page 3 of 6                    MGNR 02/25/08 1:09 PM 6210833171

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

(1) WHEN MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B(2) BELOW SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of the title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(2) UNTIL MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL READ AS FOLLOWS:

TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.  AS USED IN THIS SECTION 18, "INTEREST IN THE PROPERTY" MEANS ANY LEGAL OR BENEFICIAL INTEREST IN THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THOSE BENEFICIAL INTERESTS TRANSFERRED IN A BOND FOR DEED, CONTRACT FOR DEED, INSTALLMENT SALES CONTRACT OR ESCROW AGREEMENT, THE INTENT OF WHICH IS THE TRANSFER OF TITLE BY BORROWER AT A FUTURE DATE TO A PURCHASER.

IF ALL OR ANY PART OF THE PROPERTY OR ANY INTEREST IN THE PROPERTY IS SOLD OR TRANSFERRED (OR IF BORROWER IS NOT A NATURAL PERSON AND A BENEFICIAL INTEREST IN BORROWER IS SOLD OR TRANSFERRED) WITHOUT LENDER'S PRIOR WRITTEN CONSENT, LENDER MAY REQUIRE IMMEDIATE PAYMENT IN FULL OF ALL SUMS SECURED BY THIS SECURITY INSTRUMENT.  HOWEVER, THIS OPTION SHALL NOT BE EXERCISED BY LENDER IF EXERCISE IS PROHIBITED BY APPLICABLE LAW.

IF LENDER EXERCISES THIS OPTION, LENDER SHALL GIVE BORROWER NOTICE OF ACCELERATION.   THE NOTICE SHALL PROVIDE A PERIOD OF NOT LESS THAN 30 DAYS FROM THE DATE THE NOTICE IS GIVEN IN ACCORDANCE WITH SECTION 15 WITHIN WHICH BORROWER MUST PAY ALL SUMS SECURED BY THIS SECURITY INSTRUMENT.   IF BORROWER FAILS TO PAY THESE SUMS PRIOR TO THE EXPIRATION OF THIS PERIOD, LENDER MAY INVOKE ANY REMEDIES PERMITTED BY THIS SECURITY INSTRUMENT WITHOUT FURTHER NOTICE OR DEMAND ON BORROWER.

**BS899R (0402)**                     Page 5 of 6             MGNR 02/25/08 1:09 PM 6210833171

OR BK 26262 PG 4959
LAST PAGE

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
CRAIG V SIZER                                    −Borrower

_____ (Seal)
                                                 −Borrower

_____ (Seal)
                                                 −Borrower

_____ (Seal)
                                                 −Borrower

_____ (Seal)
                                                 −Borrower

_____ (Seal)
                                                 −Borrower

_____ (Seal)
                                                 −Borrower

_____ (Seal)
                                                 −Borrower

BS899R (0402)              Page 6 of 6        MGNR 02/25/08 1:09 PM 6210833171

# Exhibit 2
## (Construction Invoice)

**FP GROUP, INC**
**145 MADEIRA AVE STE 209**
**CORAL GABLES, FLORIDA 33134**
**CELL.305 299 6415 FAX305 267 5514**
**FELB@COMCAST.NET**

**PROPOSAL**

April 21, 2008

Craig V. Sizer
555 NE 57 Street
Miami, Florida

We hereby propose to furnish the materials and perform the labor necessary for the completion of architectural drawings of house to include new first floor bathroom and second floor master bathroom, including soil sample as requested by the city. Demolition and preparation work as detailed in attached schedule. Proposal does not include fees charged by city for permits.

All material is guaranteed to be as specified and the above work to be performed in accordance with the drawings and specifications submitted for above work, and completed in a substantial workmanlike manner for the sum of Fifty Six Thousand Fifty One Dollars ($56,051.00) with payments to be made as follows:

| | |
|---|---|
| 25% At signing | $14,012 |
| 10% Completion of drawings | 5.601 |
| 15% Removal of Walls and Cabinets | 8,407 |
| 15% Demolition of 2nd Floor Bath | 8,407 |
| 15% Repaired Walls 1st & 2nd Floors | 8,407 |
| 10% Installed Doors | 5,601 |
| 10% Installed Moldings | 5,616 |
| | $56,051 |

Respectfully submitted,

FP GROUP

By: Frank Lopez-Boy

Any alteration or deviation from above specifications
involving extra costs will be executed only upon written
order, and will become an extra charge over and above the
estimate. All agreements contingent upon strikes, accidents
or delays beyond our control.

**ACCEPTANCE OF PROPOSAL**

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Date 4/24/08          Signature _____

# Exhibit 3
## (Marriage Record)

Department of Health • Vital Statistics            (STATE FILE NUMBER)

## STATE OF FLORIDA
## MARRIAGE RECORD
TYPE IN UPPER CASE
USE BLACK INK
This license not valid unless seal of Clerk,
Circuit or County Court, appears thereon.

**Official Record**
Date: AUG 0 7 2009
Recit: 94652



STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the
original on file in this office AUG 0 7 2009, AD 20___
HARVEY RUVIN, Clerk of Circuit and County Courts
Deputy Clerk



2009-013833
APPLICATION NUMBER

## APPLICATION TO MARRY

| 1. GROOM'S NAME *(First, Middle, Last)* | | | 2. DATE OF BIRTH *(Month, Day, Year)* |
|---|---|---|---|
| CRAIG VERNON SIZER | | | JUN-24-1968 |

| 3a. RESIDENCE - CITY, TOWN, OR LOCATION | 3b. COUNTY | 3c. STATE | 4. BIRTHPLACE *(State or Foreign Country)* |
|---|---|---|---|
| MIAMI | MIAMI DADE | FLORIDA | NEW YORK |

| 5a. BRIDE'S NAME *(First, Middle, Last)* | 5b. MAIDEN SURNAME *(if different)* | 6. DATE OF BIRTH *(Month, Day, Year)* |
|---|---|---|
| MARIA DEL ROSARIO PEREZ | | APR-19-1974 |

| 7a. RESIDENCE - CITY, TOWN, OR LOCATION | 7b. COUNTY | 7c. STATE | 8. BIRTHPLACE *(State or Foreign Country)* |
|---|---|---|---|
| MIAMI | MIAMI DADE | FLORIDA | VENEZUELA |

WE THE APPLICANTS NAMED IN THIS CERTIFICATE, EACH FOR HIMSELF OR HERSELF, STATE THAT THE INFORMATION PROVIDED ON THIS RECORD IS CORRECT TO THE BEST OF OUR KNOWLEDGE AND BELIEF, THAT NO LEGAL OBJECTION TO THE MARRIAGE NOR THE ISSUANCE OF A LICENSE TO AUTHORIZE THE SAME IS KNOWN TO US AND HEREBY APPLY FOR LICENSE TO MARRY.

| 9. SIGNATURE OF GROOM *(Sign full name using black ink)* | 10. SUBSCRIBED AND SWORN TO BEFORE ME ON (DATE) |
|---|---|
| | AUG-04-2009 |

| 11. TITLE OF OFFICIAL | 12. SIGNATURE OF OFFICIAL *(Use black ink)* |
|---|---|
| DEPUTY CLERK | 00013112 |

| 13. SIGNATURE OF BRIDE *(Sign full name using black ink)* | 14. SUBSCRIBED AND SWORN TO BEFORE ME ON (DATE) |
|---|---|
| | AUG-04-2009 |

| 15. TITLE OF OFFICIAL | 16. SIGNATURE OF OFFICIAL *(Use black ink)* |
|---|---|
| DEPUTY CLERK | 00013112 |

## LICENSE TO MARRY

AUTHORIZATION AND LICENSE IS HEREBY GIVEN TO ANY PERSON DULY AUTHORIZED BY THE LAWS OF THE STATE OF FLORIDA TO PERFORM A MARRIAGE CEREMONY WITHIN THE STATE OF FLORIDA AND TO SOLEMNIZE THE MARRIAGE OF THE ABOVE NAMED PERSONS. THIS LICENSE MUST BE USED ON OR AFTER THE EFFECTIVE DATE AND ON OR BEFORE THE EXPIRATION DATE IN THE STATE OF FLORIDA IN ORDER TO BE RECORDED AND VALID.

| 17. COUNTY ISSUING LICENSE | 18A. DATE LICENSE ISSUED | 18B. DATE LICENSE EFFECTIVE | 19. EXPIRATION DATE |
|---|---|---|---|
| MIAMI-DADE | AUG-04-2009 | AUG-07-2009 | OCT-02-2009 |

| 20. SIGNATURE OF COURT CLERK OR JUDGE | 20b. TITLE | 20c. BY D.C. |
|---|---|---|
| Harvey Ruvin | CLERK | D1C |

## CERTIFICATE OF MARRIAGE

I HEREBY CERTIFY THAT THE ABOVE NAMED GROOM AND BRIDE WERE JOINED BY ME IN MARRIAGE IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA

| 21. DATE OF MARRIAGE *(Month, Day, Year)* | 22. CITY, TOWN, OR LOCATION OF MARRIAGE |
|---|---|
| AUG 0 7 2009 | Miami, FL |

| 23a. SIGNATURE OF PERSON PERFORMING THE CEREMONY *(Use black ink)* | 23c. ADDRESS *(of person performing ceremony)* |
|---|---|
| | 15555 BISCAYNE BLVD., MIAMI, FL |

| 23b. NAME AND TITLE OF PERSON PERFORMING THE CEREMONY *(Or notary stamp)* | 24. SIGNATURE OF WITNESS TO CEREMONY |
|---|---|
| DOMINIQUE PRATT DEPUTY CLERK | |
| | 25. SIGNATURE OF WITNESS TO CEREMONY |

## INFORMATION BELOW FOR USE BY VITAL STATISTICS ONLY - NOT TO BE RECORDED

| | 26. SOCIAL SECURITY NUMBER | 27. RACE | 28. WERE YOU EVER PREVIOUSLY MARRIED? | IF ANSWER IS 'YES' TO ITEM 28, THEN COMPLETE ITEMS 29A, 29B, 29C | | |
|---|---|---|---|---|---|---|
| | | | | 29a. NO. OF THIS MARRIAGE | 29b. LAST MARRIAGE ENDED BY *(Death, Divorce, or Annulment)* | 29c. DATE LAST MARRIAGE ENDED |
| GROOM | 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 | BLACK | ☑ NO  ☐ YES | 1 | | |

| | 30. SOCIAL SECURITY NUMBER | 31. RACE | 32. WERE YOU EVER PREVIOUSLY MARRIED? | IF ANSWER IS 'YES' TO ITEM 28, THEN COMPLETE ITEMS 29A, 29B, 29C | | |
|---|---|---|---|---|---|---|
| | | | | 33a. NO. OF THIS MARRIAGE | 33b. LAST MARRIAGE ENDED BY *(Death, Divorce, or Annulment)* | 33c. DATE LAST MARRIAGE ENDED |
| BRIDE | | OTHER | ☑ NO  ☐ YES | 1 | | |

DH 734, 4/98 (Replaces Feb, 91 edition)

# Exhibit 4
## (Factual Proffer)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 16-20715-CR-COOKE

**UNITED STATES OF AMERICA,**

v.

**CRAIG SIZER**

      **Defendant.**

_____/

## FACTUAL PROFFER

Had this case proceeded to trial, the parties agree that the Government would have proven the following facts beyond a reasonable doubt. The parties agree that these facts, which are true, do not include all facts known to the Government and Defendant Craig Sizer relating to the Indictment. The parties agree that these facts are sufficient to prove the guilt of the Defendant as to Count 1 of the above-referenced Indictment.

From approximately September 2009, through approximately December 2015, in the Southern District of Florida and elsewhere, Craig Sier conspired with others, including Miguel Mesa, Keith Houlihan, Charles K. Topping, and Anita Sgarro, to defraud over 700 individuals. This defendant and others participated in a scheme to defraud that raised approximately $23 million from the sale of stock tied to two corporations named Sanomedics International Holdings, Inc. ("Sanomedics") and Fun Cool Free ("FCF").

This conspiracy occurred by means of materially false and fraudulent pretenses, as well as material omissions, to knowingly devise a scheme and artifice to defraud and to obtain money and property through the delivery of certain mail matter and through certain wire communications, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349.

During the course of the conspiracy, Sanomedics claimed to develop and market a line of non-contact infrared thermometers principally for consumer home healthcare for children and, under the "ThermoPet" brand name, for dogs. Sanomedics publically traded under the stock symbol "SIMH." FCF claimed it held a smartphone gaming portfolio with over 500 gaming applications.

Sizer was Sanomedics' cofounder, Chief Executive Officer, and a controlling shareholder of Sanomedics. He was also a controlling shareholder and officer and director of FCF. From around May 2009 until about May 2010, Sizer and Houlihan solicited, offered, and sold shares of Sanomedics stock to investors to raise capital for Sanomedics. Beginning around September 2009, Sizer hired Mesa to solicit, offer and sell shares of Sanomedics stock to investors via telemarketing. Mesa hired others, mainly sales men and women, to solicit investors to purchase stock. Mesa, with Sizer's permission, also hired Sgarro to operate her own group that sold the same stock.

Mainly through the use of these "boiler rooms," opened and run by Mesa and Sgarro, this Defendant and his co-conspirators solicited investors to buy shares of Sanomedics stock in private placement offerings, and eventually, Sanomedics common stock traded on the Over-The-Counter Bulletin Board. Later, in 2014 to 2015, they also sold FCF stock.

Sizer and Mesa created sales "scripts" used to solicit potential investors. Sales agents under Mesa often added other material statements to their own scripts that they used to pitch the stock sales. To sell Sanomedics and FCF stock, this defendant and his co-conspirators told potential investors that, for a limited time only, a "limited number" of shares of Sanomedics stock were available to them at a steep discount to the price of shares trading on the OTCBB. The defendants knew this to be false because Sizer and others controlled the number of Sanomedics and FCF shares and often authorized "stock splits" to generate more shares. Investors were also told that no commissions or fees were charged, when, in fact, Mesa and his team only made money through commissions taken from investor proceeds.

During the conspiracy, Sizer used the money received from investors for, among other things, sales commissions, fees, and other monetary distributions to himself, to sales agent managers, and others they hired, including Mesa. Sizer paid Mesa 50% of all money raised by Mesa and his sales people in Mesa's boiler room. Mesa used this money to pay himself, his salespeople, including this Defendant, and others, a commission on sales of stock. Pursuant to his agreement with the salespeople he hired, Mesa paid all salespeople by commission, directly tied to a salesperson's given sale of stock to a particular investor. No salesperson was paid with stock or salary. All combined, the defendants and their co-conspirators used approximately 80% of investor proceeds in undisclosed commissions and fees.

To induce investors to provide money to the defendants and their co-conspirators, this Defendant and his co-conspirators made numerous materially false and fraudulent statements to investors, including, but not limited to: (a) That no commission or fees would be charged to investors; (b) That sales agents were employees of Sanomedics and FCF, providing investors a unique opportunity to purchase a "limited number of shares" directly from the company; (c) That Sanomedics was a "safe investment," "profitable investment," and one where "you won't lose money"; and (d) That J.S., a former CEO of Apple Inc. and former president of PepsiCo, was the largest Sanomedics investor and was on the Sanomedics Board of Directors.

They similarly lied about J.S. and other people's affiliation with Sanometics and FCF, and lied to investors by telling them that FCF had a partnership with Apple Inc.

Date: 2/23/17

By: _____
Roger Cruz
Assistant United States Attorney

Kevin B. Hart
Special Assistant U.S. Attorney

Date: 2/23/17

By: _____
Dennis Urbano, Esq.
Attorney for Defendant

Date: 2/23/17

By: _____
Craig Sizer
Defendant

3

# Exhibit 5
## (Quit Claim Deed and Emails)

CFN 2015R0701505
OR BK 29838 Pgs 4554-4555 (2Pgs)
RECORDED 11/03/2015 09:09:58
DEED DOC TAX $2,460.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

PREPARED BY:  WILLIAM T. COLEMAN
BRINKLEY MORGAN
200 E. Las Olas Boulevard, 19th Floor
Fort Lauderdale, FL  33301

Parcel Tax Identification No.: 01-3218-036-0500

## QUIT CLAIM DEED

THIS QUIT CLAIM DEED, executed this 1st day of  September, 2015, by CRAIG V. SIZER, joined by his wife, MARIA SIZER, whose post office address is 555 N.E. 57th Street, Miami, FL  33317, first party, to CRAIG V. SIZER and MARIA SIZER, husband and wife, whose post office address is 555 N.E. 57th Street, Miami, FL  33317, second party.

WITNESSETH, that said first party, for and in consideration of the sum of TEN DOLLARS ($10.00) in hand paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quit claim unto the said second party forever, all the right, title, interest, claim and demand which the said first party has in and to the following described land situate, lying and being in Miami-Dade County, Florida, to wit:

Lot 13, in Block 17, BAYSHORE UNIT #2, according to the Plat thereof, recorded In Plat Book 9, Page 98, of the Public Records of Miami-Dade County, Florida.

Subject to a mortgage originally in favor of Bank of America, N.A.

N.B. This Quit-Claim Deed was prepared without examination of title.

TO HAVE AND TO HOLD the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of the said first party, either in law or equity, to the only proper use, benefit and behoof of the said second party forever.

 Gmail

Brian Silber, Esq. <silberlaw@gmail.com>

---

## Fwd: 19501 W Country Club Drive #1610 Aventura, Fl (6277.00)

**craig sizer** <mercurycapllc@gmail.com>                                         Wed, Aug 30, 2017 at 5:02 PM
To: silberlaw@gmail.com
Cc: Craig Sizer <mercurycapllc@gmail.com>

Begin forwarded message:

**From:** Isamary Vinson <isamary@universaltitlelaw.com>
**Subject: 19501 W Country Club Drive #1610 Aventura, Fl (6277.00)**
**Date:** January 5, 2016 at 3:29:57 PM EST
**To:** craig sizer <craig@clsholdings.net>
**Cc:** Admin <info@crawfordmiami.com>, Stephen Vinson <steve@universaltitlelaw.com>, Isamary Vinson <isamary@universaltitlelaw.com>

Mr. Sizer:

I know you originally took title as a single man, but since you are now married and this was/is your homestead- I will need your spouse's name as she will need to sign the Deed.

Please forward me her complete legal name so I can have same when I prepare all the documents.

Thank you!

---

On Jan 5, 2016, at 1:22 PM, Isamary Vinson <isamary@universaltitlelaw.com> wrote:

Perfect. Thank you.

**Isamary Vinson | Stephen L. Vinson, Jr., P.A.**
**1200 Brickell Avenue, Suite 1440**
**Miami, Florida** 33131
**Isamary@universaltitlelaw.com**
**Office: +1 305-375-9510**, Ext. 301
**Fax: +1 305-**675-3160

8/30/2017

# Exhibit 6
## (Plea Agreement)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No.: 16-20715-CR-COOKE

**UNITED STATES OF AMERICA**

**vs.**

**CRAIG SIZER,**

      **Defendant.**

_____/

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office" or "the government") and Craig Sizer (hereinafter referred to as the "defendant") enter into the following agreement:

1.      The defendant agrees to plead guilty to Count 1 of the Indictment, which charges the defendant with Conspiracy to Commit Wire and Mail Fraud, in violation of Title 18, United States Code, Section 1349.  After sentencing, the government agrees to move to dismiss the remaining Counts of this Indictment as to this defendant.

2.      The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines").  The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the

advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3.      The defendant understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to 20 years, followed by a term of supervised release of up to 3 years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000 or not more than the greater of twice the gross gains or gross loss resulting from the offense. See 18 U.S.C. § 3571(d).

4.      The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If a defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

5.      This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses

committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

6. This Office agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, this Office will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. This Office further agrees to recommend that the defendant be sentenced at the low end of the guideline range, as that range is determined by the Court. This Office, however, will not be required to make this motion and these recommendations if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7.    This Office and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions of law as to the relevant offense as to the sentence to be imposed:

| | |
|---|---|
| Base offense level: | The base offense level is 7 under Guideline 2B1.1; |
| Loss: | More than $9,500,000 but less than $25,000,000, per 2B1.1(b)(1)(K), adding 20 levels; |
| Victims: | Involved substantial financial hardship to five or more victims, per 2B1.1(b)(2)(B), adding 4 levels; |
| Role: | The defendant was an organizer and leader of a criminal activity that involved 5 or more participants and was otherwise extensive, per 3B1.1(a), adding 4 levels; and |
| Securities Fraud: | Involved a violation of securities law while the defendant was an officer and director of a publicly traded company, per 2B1.1(b)(19), adding 4 levels |

8.    Assuming the Court agrees with an adjusted offense level of at least 36 <u>and</u> the defendant fully complies with all obligations contained in this Plea Agreement, the government agrees to recommend a sentence at the low-end of the Sentencing Guidelines' range.   Also, the defendant may argue for a sentencing variance pursuant to the factors enumerated in Title 18, United States Code, Section 3553(a). The defendant is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the probation office, is a prediction, not a promise, and is not binding on this Office, the probation office or the Court.   The defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety.   The defendant understands and acknowledges, as previously

acknowledged in paragraph 3 above, that the defendant may not withdraw the defendant's plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, this Office, or a recommendation made jointly by the defendant and this Office.

<strong>Immigration Status</strong>

9.     The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status, if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, and, in some cases, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the district Court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. In addition, the defendant's plea might have consequences with respect to whether the defendant is committed civilly.   The defendant nevertheless affirms the desire to plead guilty regardless of any immigration or civil commitment consequences that the plea may entail, even if the consequence is automatic removal from the United States or civil commitment. The defendant is aware that the sentence has not yet been determined by the Court.

10.     The defendant agrees that the defendant shall cooperate fully with this Office by: (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other Court proceeding; (b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by this Office; and (c) if requested by this Office, working in an undercover role under the supervision of, and in compliance with, law enforcement officers and agents.   In addition, the defendant agrees that the

defendant will not protect any person or entity through false information or omission, that the defendant will not falsely implicate any person or entity, and that the defendant will not commit any further crimes.

11.     This Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make that cooperation, or lack thereof, known to the Court at the time of sentencing.   If in the sole and unreviewable judgment of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the advisory sentencing range calculated under the Sentencing Guidelines and/or any applicable minimum mandatory sentence, this Office may make a motion prior to sentencing pursuant to Section 5K1.1 of the Sentencing Guidelines and/or Title 18, United States Code, Section 3553(e), or subsequent to sentencing pursuant to Rule 35 of the Federal Rules of Criminal Procedure, informing the Court that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced.   The defendant understands and agrees, however, that nothing in this agreement requires this Office to file any such motions, and that this Office's assessment of the quality and significance of the defendant's cooperation shall be binding as it relates to the appropriateness of this Office's filing or non-filing of a motion to reduce sentence.

12.     The defendant understands and acknowledges that the Court is under no obligation to grant a motion for reduction of sentence filed by this Office.   In addition, the defendant further understands and acknowledges that the Court is under no obligation of any type to reduce the defendant's sentence because of the defendant's cooperation.

**Forfeiture**

13.     The defendant agrees to forfeit to the United States, voluntarily and immediately, all of the defendant's right, title and interest the defendant has, or any corporation or entity the defendant controls or affects has, to any property used or intended to be used to commit, to facilitate, or to promote the commission of the conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. § 1349; and constituting, derived from, or traceable to the gross proceeds the defendant obtained directly or indirectly as a result of such violation, pursuant to 18 U.S.C. § 982(a)(8). The defendant agrees that the following real properties were derived from or are traceable to gross proceeds and are subject to forfeiture: 555 N.E. 57 Street, Miami, FL.

14.     The defendant specifically agrees to the entry of a forfeiture money judgment in the amount of $22,456,186, which sum represents the fraud loss attributed to this defendant as a result of said violation.

15.     The defendant also agrees to assist this Office in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all rights, title, and interest, regardless of their nature or form, in all assets, including real and personal property, cash and other monetary instruments, wherever located, which the defendant or others to the defendant's knowledge have accumulated as a result of illegal activities. Such assistance shall include the identification of all assets subject to forfeiture, whether directly subject to forfeiture or as substitute assets and the transfer of such assets to the United States, by delivery upon request, of all necessary and appropriate documentation with respect to the assets, including consents to forfeiture, quit claim deeds, and any and all other documents necessary to deliver good and marketable title to said property and assets.   Additionally, the defendant agrees to the entry of an order enjoining the transfer or encumbrance of assets that may be identified as being subject to

forfeiture. The defendant knowingly and voluntarily agrees that the defendant shall not oppose the United States in its motion for entry of a Preliminary Order of Forfeiture regarding the Forfeitable Property, which the United States shall make upon acceptance of the defendant's plea of guilty in accordance with this Plea Agreement.

16.     The defendant knowingly and voluntarily agrees to waive any claim or defense the defendant may have under the Eighth Amendment to the United States Constitution, including any claim of excessive fine or penalty with respect to the forfeited property. The defendant also agrees to waive any appeal for the forfeiture. In addition, the defendant agrees to waive any applicable time limits for the initiation of administrative forfeiture and/or further notification of any judicial or administrative forfeiture proceedings brought against the property.

### Restitution

17.     The defendant understands and acknowledges that the Court must order restitution for the full amount of the victims' losses pursuant to 18 U.S.C. § 3663A. Defendant understands that the amount of restitution owed to each victim will be determined at or before sentencing unless the Court orders otherwise. This Office and the defendant stipulate and agree that the amount of restitution that the defendant shall pay to is $22,456,186. This Office agrees to seek preliminary approval from the Asset Forfeiture and Money Laundering Section to have forfeited property restored to satisfy the restitution order.

18.     The defendant agrees to make full and accurate disclosure of the defendant's financial affairs to this Office and the probation office. Specifically, defendant agrees that, within thirty calendar days of the signing of this Plea Agreement, defendant shall submit a completed Financial Disclosure Statement (form provided by this Office), and shall fully disclose and identify all assets in which the defendant has any interest and/or over which the defendant exercises control,

directly or indirectly, including those held by a spouse, nominee, or other third party. Defendant agrees to provide, in a timely manner, all financial information requested by this Office and the probation office, and upon request, to meet in person to identify assets/monies which can be used to satisfy the restitution, forfeiture, and/or fine ordered or imposed. In addition, defendant expressly authorizes this Office to obtain a credit report on him.

19.     The defendant agrees that the defendant will not sell, hide, waste, encumber, destroy, or otherwise devalue any asset until the defendant's restitution, forfeiture, and/or fine is paid in full without the prior approval of this Office. Defendant shall also identify any transfer of assets valued in excess of $5,000 since the date of information/indictment or when the defendant became aware of the criminal investigation, including the identity of the asset, the value of the asset, the identity of the third party to whom the asset was transferred, and the current location of the asset.  The defendant agrees to cooperate fully in the investigation and the identification of assets to be applied toward any restitution and/or forfeiture ordered, and/or fine imposed. Defendant further agrees to liquidate assets, or complete any other tasks, as requested by this Office, which will result in full payment of the restitution, forfeiture, and/or fine in the shortest possible time.

20.     The defendant agrees that providing false or incomplete information about the defendant's financial assets; hiding, selling, transferring or devaluing assets; and/or failing to cooperate fully in the investigation and identification of assets may be used by this Office as a basis for recommending a denial of a reduction for acceptance of responsibility pursuant to Sentencing Guidelines Section 3E1.1, and also may be used in making any recommendation regarding the sentence to be imposed by the Court. In addition, this conduct may form the basis for separate charges against the defendant, including, but not limited to, charges under 18 U.S.C.

§ 1001.

21.    **Standard Waiver:**  The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford the defendant the right to appeal the sentence imposed in this case.   Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, including any restitution order, forfeiture order or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing.   The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b) and Title 28, United States Code, Section 1291.   However, if the United States appeals the defendant's sentence pursuant to Sections 3742(b) and 1291, the defendant shall be released from the above waiver of appellate rights.   By signing this agreement, the defendant acknowledges that the defendant has discussed the appeal waiver set forth in this agreement with the defendant's attorney.

22.    The defendant confirms that the defendant is guilty of the offense to which the defendant is pleading guilty; that the defendant's decision to plead guilty is the decision that the defendant has made; and that nobody has forced, threatened, or coerced the defendant into pleading guilty.   The defendant accordingly affirms that the defendant is entering into this agreement knowingly, voluntarily, and intelligently, and with the benefit of full, complete, and effective assistance by the defendant's attorney.

23.    The defendant agrees to having consulted with the defendant's attorney and fully understands all rights with respect to the pending charges.   Further, the defendant was advised

and fully understands all rights with respect to the provisions of the Sentencing Guidelines which may apply in this case.   The defendant understands the constitutional rights associated with going to trial, including the right to be represented by counsel, the right to plead not guilty, the right to trial by jury, the right to confront and cross-examine adverse witnesses, the right to be protected from compelled self-incrimination, the right to testify and present evidence, and the right to compel the attendance of witnesses.   By signing below, the defendant attests to having read this agreement, carefully reviewed every part of it with the defendant's attorney, and to being satisfied with the advice and representation of the defendant's attorney regarding the decision to enter into the agreement.   The defendant voluntarily agrees to be bound by every term and condition set forth herein.   The defendant affirms that the defendant has discussed this matter thoroughly with the defendant's attorney.   The defendant further affirms that the defendant's discussions with defense counsel have included discussion of possible defenses that the defendant might raise if the case were to go to trial, as well as possible issues and arguments that the defendant may raise at sentencing.   The defendant additionally affirms that the defendant is satisfied with the representation provided defense counsel.

24.     The defendant confirms that the defendant has read this plea agreement, or that this plea agreement has been read to the defendant.   If the defendant does not understand English, the defendant confirms that this plea agreement has been translated into the defendant's native language and that the defendant has read this plea agreement, or that this plea agreement has been read to the defendant in the defendant's native language.

25.    This is the entire agreement and understanding between this Office and the
defendant.    There are no other agreements, promises, representations, or understandings.

WILFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 2/23/17            By: _____
                             Roger Cruz
                             Assistant U. S. Attorney

Date: 2/23/17            By: _____
                             Dennis Urbano, Esq.
                             Attorney for Defendant

Date: 2/23/17            By: _____
                             Craig Sizer
                             Defendant

# Exhibit 7
## (Market Study)

# Comparative Market Analysis

"This is an opinion of value or Comparative Market Analysis and should not be considered an appraisal . In making any decision that relies upon my work, you should know that I have not followed the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation ."



Researched and prepared by

Jami R Agins

Prepared exclusively for

Brian Silber

Prepared on
September 22, 2017

Subject Property

555 NE 57th St

Miami

33137-2626



Jami R Agins

Re/Max Ultra Realty Group

212 NE 24th St

Miami, FL 33137

C: 305.775.2389

jagins@MiamiProperty.com

# Comparative Market Analysis

555 NE 57th St

Miami-Dade County, 33137

Friday, September 22, 2017

## Summary of Comparable Listings

This page summarizes the comparable listings contained in this market analysis.

### Active Listings

| Address | Price | Bds | Bth | Sqft Tot | Acres | List Date | DOM |
|---|---|---|---|---|---|---|---|
| 555 NE 57th St | | *4* | *4* | *3398* | *6,480.000* | | |
| 655 NE 50th Ter | $1,300,000 | 4 | 3 | | | | 74 |
| 602 NE 59th St | $1,499,000 | 4 | 4 | 3,987 | | | 329 |
| 570 NE 52nd Ter | $1,550,000 | 4 | 3 | 2,139 | | | 148 |
| Averages: | **$1,449,667** | **4.0** | **3.3** | **3,063** | | | **184** |

### Closed Sale Listings

| Address | Price | Bds | Bth | Sqft Tot | Acres | Sale Date | DOM |
|---|---|---|---|---|---|---|---|
| 555 NE 57th St | | *4* | *4* | *3398* | *6,480.000* | | |
| 611 NE 53rd St | $960,000 | 3 | 2 | 2,158 | | 03/27/2017 | 20 |
| 500 NE 57th St | $1,420,000 | 3 | 3 | 2,833 | | 04/13/2017 | 48 |
| 549 NE 55th St | $1,475,000 | 4 | 5 | 2,900 | | 06/27/2017 | 207 |
| Averages: | **$1,285,000** | **3.3** | **3.3** | **2,630** | | | **92** |

### Expired Listings

| Address | Price | Bds | Bth | Sqft Tot | Acres | Expire Date | DOM |
|---|---|---|---|---|---|---|---|
| 555 NE 57th St | | *4* | *4* | *3398* | *6,480.000* | | |
| 5800 NE 6th Ct | $1,399,000 | 3 | 3 | 2,240 | | 09/01/2017 | 94 |
| Averages: | **$1,399,000** | **3.0** | **3.0** | **2,240** | | | **94** |

| | Low | Median | Average | High | Count |
|---|---|---|---|---|---|
| **Comparable Price** | $960,000 | $1,420,000 | $1,371,857 | $1,550,000 | 7 |
| **Adjusted Comparable Price** | $960,000 | $1,420,000 | $1,371,857 | $1,550,000 | 7 |

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## CMA Price Adjustments

This page outlines the subject property versus comparables properties.

  

| Subject Property | | Details | Adjust | Details | Adjust |
|---|---|---|---|---|---|
| 555 NE 57th St | | 655 NE 50th Ter | | 602 NE 59th St | |
| MLS# | | A10252343 | | A10164421 | |
| Status | | Active | | Active | |
| List Price | | $1,300,000 | | $1,499,000 | |
| List Date | | | | | |
| Sold Price | | | | | |
| Sold Date | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Subdiv | Bayshore Unit 02 | Park Plaza | 0 | Bayshore Unit 02 | 0 |
| City/County | Miami-Dade County | Miami-Dade County | 0.00 | Miami-Dade County | 0.00 |
| Zip | 33137 | 33137 | 0 | 33137 | 0 |
| Sqft Total | 3398 | 0 | | 3,987 | 0 |
| # Levels | 2 | | 0 | | 0 |
| DOM | 38 | 74 | 0 | 329 | 0 |
| Beds | 4 | 4 | 0 | 4 | 0 |
| Baths | 4 (3 1) | 3 (3 0) | 0/0 | | 0/0 |
| Parking | Driveway | Circular Drive | | Covered Parking | |
| Pool on Prop | Yes | False | 0 | True | 0 |
| Year Built | 1940 | 1953 | 0 | 1932 | 0 |
| Acres | 6480 | | 0 | | 0 |

### Remarks:

Drastically reduced for a Quick Sale! Historic Morningside Smart Home! NEW EVERYTHING! This 4/3.5 includes Guest Cottage w/full steam bath & pool/hot tube. The home has been modified to fit the most sophisticated owner w/ a Crestron System that runs the entire property, Chef's Kitchen & exterior bbq/w High End appliances such as Sub Zero/Wolf! The Ensuite Bed & Bath Spa is a getaway all in itself w/ a Kohler DTV Shower & Steam, Jacuzzi & 2 custom walk-in closets. To much to list!

Beautifully remodelled 4 Bedroom House in exclusive Morningside Historic District! Stainless steel state of the art appliances. Perfect for entertaining with Florida Room overlooking the backyard. Master bedroom exits to the backyard through private patio. Split plan (guest room / family rooms). A few feet away from beautiful Morningside park. Gated community very safe. Space to add pool!

Reduced over 200K! Move-in before school starts! New electric + interior newly painted a neutral white. Treasured Morningside landmark 3/4 home w/gorgeous coral rock exterior on over-sized 15,952SF gated/walled corner lot with incredible backyard/playground. Roomy office can be 4th bed. Grand living spaces w cathedral ceilings, 2 fireplaces, huge fenced backyard. Enjoy heated pool, impact winds/drs, 2-car garage, master bedroom on 1st fl + generator. Fall in love w/this architectural gem in the sought after upper Morningside location. Due to high elevation, flood insurance is not required. Generator and stove are on natural

| | | |
|---|---|---|
| **Price** | **$1,300,000** | **$1,499,000** |
| **Total Adjustments** | **$0** | **$0** |
| **Adjusted Price** | **$1,300,000** | **$1,499,000** |

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## CMA Price Adjustments
This page outlines the subject property versus comparables properties.

  

| Subject Property | | Details | Adjust | Details | Adjust |
|---|---|---|---|---|---|
| 555 NE 57th St | | 570 NE 52nd Ter | | 611 NE 53rd St | |
| MLS# | | A10266556 | | A10211527 | |
| Status | | Active | | Closed Sale | |
| List Price | | $1,550,000 | | $1,040,000 | |
| List Date | | | | 01/22/2017 | |
| Sold Price | | | | $960,000 | |
| Sold Date | | | | 03/27/2017 | |

| | | | | | |
|---|---|---|---|---|---|
| Subdiv | Bayshore Unit 02 | PARK PLAZA CORR PL OF | 0 | Park Plaza | 0 |
| City/County | Miami-Dade County | Miami-Dade County | 0.00 | Miami-Dade County | 0.00 |
| Zip | 33137 | 33137 | 0 | 33137 | 0 |
| Sqft Total | 3398 | 2,139 | 0 | 2,158 | 0 |
| # Levels | 2 | | 0 | | 0 |
| DOM | 38 | 148 | 0 | 20 | 0 |
| Beds | 4 | 4 | 0 | 3 | 0 |
| Baths | 4 (3 1) | 3 (3 0) | 0/0 | | 0/0 |
| Parking | Driveway | Driveway | | Driveway | |
| Pool on Prop | Yes | True | 0 | True | 0 |
| Year Built | 1940 | 1955 | 0 | 1950 | 0 |
| Acres | 6480 | | 0 | | 0 |

### Remarks:

Drastically reduced for a Quick Sale! Historic Morningside Smart Home! NEW EVERYTHING! This 4/3.5 includes Guest Cottage w/full steam bath & pool/hot tube. The home has been modified to fit the most sophisticated owner w/ a Crestron System that runs the entire property, Chef's Kitchen & exterior bbq/w High End appliances such as Sub Zero/Wolf! The Ensuite Bed & Bath Spa is a getaway all in itself w/ a Kohler DTV Shower & Steam, Jacuzzi & 2 custom walk-in closets. To much to list!

This 4/3 house has been completely remodeled from top to bottom with taste and top of the line appliances. Minutes away from the Biscayne Corridor, Midtown Miami, Design District, Winwood and Miami beach. Very modern feel with big size tiles and marble. Modern all new Italian Kitchen with built in expresso machine. Video surveillance system with cameras in all rooms. Fantastic outdoor area with backyard porch awning covered sitting area next to the new pool. Features open layout and large living spaces; unique combined open floor plan in master bed/bath; brand new kitchen and baths w/ custom cabinetry and appliances;

Beautiful house by MORNINGSIDE PARK on Biscayne Bay (upper east side of MIA). FULLY RENOVATED, bright and well maintained, with wood flooring and higher ceilings. Modern NEW KITCHEN with high-end appliances (Subzero/Wolf) and SPACIOUS OUTSIDE AREA with a great OUTDOOR KITCHEN. GATED COMMUNITY, less than 5-min walking from 30-acre park, with playground, tennis, basketball, kayaking, boat dock, walking trails, among others. Few minutes from Design District, Wyndwood and easy access to downtown and beach.

| | | |
|---|---|---|
| Price | $1,550,000 | $960,000 |
| Total Adjustments | $0 | $0 |
| Adjusted Price | $1,550,000 | $960,000 |

Researched and prepared by **Jami Agins**

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## CMA Price Adjustments

This page outlines the subject property versus comparables properties.

  

| **Subject Property** | | **Details** | **Adjust** | **Details** | **Adjust** |
|---|---|---|---|---|---|
| 555 NE 57th St | | 500 NE 57th St | | 549 NE 55th St | |
| MLS# | | A10204621 | | A10153927 | |
| Status | | Closed Sale | | Closed Sale | |
| List Price | | $1,485,000 | | $1,495,000 | |
| List Date | | 01/02/2017 | | 09/25/2016 | |
| Sold Price | | $1,420,000 | | $1,475,000 | |
| Sold Date | | 04/13/2017 | | 06/27/2017 | |

| | | | | | |
|---|---|---|---|---|---|
| Subdiv | Bayshore Unit 02 | BAYSHORE | 0 | Bayshore Plaza Resub | 0 |
| City/County | Miami-Dade County | Miami-Dade County | 0.00 | Miami-Dade County | 0.00 |
| Zip | 33137 | 33137 | 0 | 33137 | 0 |
| Sqft Total | 3398 | 2,833 | 0 | 2,900 | 0 |
| # Levels | 2 | | 0 | | 0 |
| DOM | 38 | 48 | 0 | 207 | 0 |
| Beds | 4 | 3 | 0 | 4 | 0 |
| Baths | 4 (3 1) | 3 (3 0) | 0/0 | 5 (4 1) | 0/0 |
| Parking | Driveway | Other Parking | | Driveway, Guest Parking, S | |
| Pool on Prop | Yes | False | 0 | True | 0 |
| Year Built | 1940 | 1936 | 0 | 1939 | 0 |
| Acres | 6480 | | 0 | | 0 |

**Remarks:**

Drastically reduced for a Quick Sale! Historic Morningside Smart Home! NEW EVERYTHING! This 4/3.5 includes Guest Cottage w/full steam bath & pool/hot tube. The home has been modified to fit the most sophisticated owner w/ a Crestron System that runs the entire property, Chef's Kitchen & exterior bbq/w High End appliances such as Sub Zero/Wolf! The Ensuite Bed & Bath Spa is a getaway all in itself w/ a Kohler DTV Shower & Steam, Jacuzzi & 2 custom walk-in closets. To much to list!

This enchanting 2-story villa sits on a 7,011 SF corner lot in the most desired Morningside area. The home boasts fine designer finishes, hand-made Cuban tiles & exquisite oak wood floors, spacious dining & living room w/fireplace. Gourmet kitchen w/top appliances and adjacent breakfast room. Master suite encompasses entire 2nd floor w/full room closet & beautiful Calacatta Gold marble master bath with steam. Private backyard garden & seating area, mature landscaped grounds.Smart Home & Wi-Fi integration.

Tasteful Gut Renovation in historic Morningside no expense spared 4bed 4.5bath spacious and bright on 8250 sf lot with swimming pool. Oak floors, ample storage throughout, all bedrooms include en-suite baths. Custom solid teak vanities and top of line fixtures. Open living/dining/gourmet custom kitchen w 10ft ceilings and wrap around windows overlooking garden and pool. Fully wired for sound, data + ADT system. Beautiful,gated quiet residential neighborhood w/tennis courts parks and plenty of green space.

| | | |
|---|---|---|
| **Price** | $1,420,000 | $1,475,000 |
| **Total Adjustments** | $0 | $0 |
| **Adjusted Price** | $1,420,000 | $1,475,000 |

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## CMA Price Adjustments

This page outlines the subject property versus comparables properties.

 

| Subject Property | | Details | Adjust |
|---|---|---|---|
| 555 NE 57th St | | 5800 NE 6th Ct | |
| MLS# | | A10284973 | |
| Status | | Expired | |
| List Price | | $1,399,000 | |
| List Date | | 05/30/2017 | |
| Sold Price | | | |
| Sold Date | | | |

| | | | |
|---|---|---|---|
| Subdiv | Bayshore Unit 02 | BAYSHORE UNIT NO 2 | 0 |
| City/County | Miami-Dade County | Miami-Dade County | 0.00 |
| Zip | 33137 | 33137 | 0 |
| Sqft Total | 3398 | 2,240 | 0 |
| # Levels | 2 | | 0 |
| DOM | 38 | 94 | 0 |
| Beds | 4 | 3 | 0 |
| Baths | 4 (3 1) | 3 (2 1) | 0/0 |
| Parking | Driveway | Covered Parking, Driveway | |
| Pool on Prop | Yes | True | 0 |
| Year Built | 1940 | 1949 | 0 |
| Acres | 6480 | | 0 |

**Remarks:**

Drastically reduced for a Quick Sale! Historic Morningside Smart Home! NEW EVERYTHING! This 4/3.5 includes Guest Cottage w/full steam bath & pool/hot tube. The home has been modified to fit the most sophisticated owner w/ a Crestron System that runs the entire property, Chef's Kitchen & exterior bbq/w High End appliances such as Sub Zero/Wolf! The Ensuite Bed & Bath Spa is a getaway all in itself w/ a Kohler DTV Shower & Steam, Jacuzzi & 2 custom walk-in closets. To much to list!

RENOVATED TO EXCELLENCE IN 2017. Located in the exclusive Mimo Historic Morningside Disctrict, this magnificent 1940s home rests upon an impressive sized corner lot with magnificent ocean views just a walking distance away.  This property features 3BR/2.5BA with beautifully groomed landscaping giving the pool area a resort style feel.  Inside, you will be welcomed with natural lighting throughout the open floor plan, including a modern kitchen with high-end appliances, spectacular finishes such as refinished vintage pine wood floors, terrazo floors, expansive modernized bathrooms, high impact windows, Dornbracht fixtures, salt

| | |
|---|---|
| **Price** | **$1,399,000** |
| **Total Adjustments** | **$0** |
| **Adjusted Price** | **$1,399,000** |

Researched and prepared by **Jami Agins**

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## List Price and Sale Price

This graph illustrates the list price, along with sale price in Sold listings.



# Comparative Market Analysis

555 NE 57th St

Miami-Dade County, 33137

Friday, September 22, 2017

## Brief Summary of Compared Listings

This report summarizes the comparable listings contained in this market analysis.

### Status: Active

| MLS# | Stat Date | Address | City | Sqft | Bds | Bth | L/S Price |
|------|-----------|---------|------|------|-----|-----|-----------|
| A10252343 | | 655 NE 50th Ter | Miami | | 4 | 3.0 | $1,300,000 |
| A10164421 | | 602 NE 59th St | Miami | 3,987 | 4 | | $1,499,000 |
| A10266556 | | 570 NE 52nd Ter | Miami | 2,139 | 4 | 3.0 | $1,550,000 |
| **Averages:** | | | | **3,063** | **4** | **3.0** | **$1,449,667** |

### Status: Closed Sale

| MLS# | Stat Date | Address | City | Sqft | Bds | Bth | L/S Price |
|------|-----------|---------|------|------|-----|-----|-----------|
| A10211527 | 03/27/2017 | 611 NE 53rd St | Miami | 2,158 | 3 | | $960,000 |
| A10204621 | 04/13/2017 | 500 NE 57th St | Miami | 2,833 | 3 | 3.0 | $1,420,000 |
| A10153927 | 06/27/2017 | 549 NE 55th St | Miami | 2,900 | 4 | 4.5 | $1,475,000 |
| **Averages:** | | | | **2,630** | **3** | **3.8** | **$1,285,000** |

### Status: Expired

| MLS# | Stat Date | Address | City | Sqft | Bds | Bth | L/S Price |
|------|-----------|---------|------|------|-----|-----|-----------|
| A10284973 | 09/01/2017 | 5800 NE 6th Ct | Miami | 2,240 | 3 | 2.5 | $1,399,000 |
| **Averages:** | | | | **2,240** | **3** | **2.5** | **$1,399,000** |

## Summary

| Status | Total | Avg Price | Avg $ Per SqFt | Median | Low | High | Avg DOM |
|--------|-------|-----------|----------------|--------|-----|------|---------|
| Active | 3 | $1,449,667 | $550.31 | $1,499,000 | $1,300,000 | $1,550,000 | 184 |
| Closed Sale | 3 | $1,285,000 | $484.91 | $1,420,000 | $960,000 | $1,475,000 | 92 |
| Expired | 1 | $1,399,000 | $624.55 | $1,399,000 | $1,399,000 | $1,399,000 | 94 |
| **Total** | **7** | **$1,371,857** | **$529.98** | **$1,420,000** | **$960,000** | **$1,550,000** | **131** |

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## Pricing Recommendation

This page suggests a recommended selling price based on a thorough analysis of your property.

**After analyzing your property, comparable properties on the market now, recent sales and comparable properties that failed to sell, I conclude that in the current market, your property is most likely to sell for $1,429,000.**

Researched and prepared by **Jami Agins**

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## Activity vs. Timing

This chart highlights the importance of pricing correctly at market value.



This chart illustrates the level of excitement and interest in a new listing over time. It also demonstrates the importance of pricing correctly. When a property is first listed, it generates a very high level of interest from prospective buyers, which reduces dramatically over time. It is important to be priced correctly from the beginning, during the peak of this curve.

Researched and prepared by **Jami Agins**

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## The Effect of Over Pricing

This chart highlights the importance of pricing correctly at market value.

This is the average percentage difference between the Selling and Asking Price by the length of time the home was on the market.



- Put your best foot forward immediately
- Establish a competitive asking price
- Keep your home in top showing condition
- Offer favorable financing terms

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## The Importance of Pricing

This chart highlights the importance of pricing correctly at market value.



    This graph illustrates the importance of pricing correctly. The centerline represents market value. As you move above this market value, you attract much smaller percentage of prospective buyers, greatly reducing your chances of a sale. Conversely, as you move below market value, you attract a much larger percentage of potential buyers.

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## The Pitfalls of Overpricing

This chart highlights the importance of pricing correctly at market value.

Overpricing your house in the belief that you can reduce the price back later is a strategy that can backfire badly. For example, by the time you reduce your price, you may miss out on a surge of interest in properties like yours. Also, if prices are lowered, buyers may wonder if there's something wrong with the property that kept other buyers away. So to keep from selling your property at below market value and from wasting valuable time, don't fall into the overpricing trap.



Original Asking Price
(over market value)

Market Value

Selling Price
(under market value)

Months On The Market

Researched and prepared by **Jami Agins**

# Comparative Market Analysis

555 NE 57th St
Miami-Dade County, 33137

Friday, September 22, 2017

## CMA Map Layout

This page displays the Map for the CMA Subject and your comparables.



| 1 | 555 NE 57th St |
|---|---|
| 2 | 655 50Th Ter Ne |
| 3 | 602 59Th St Ne |
| 4 | 570 52Nd Ter Ne |
| 5 | 611 53Rd St Ne |
| 6 | 500 57Th St Ne |
| 7 | 549 55Th St Ne |
| 8 | 5800 6Th Ct Ne |

The figures below are prepared as a guide to you and are based on information from reliable sources.  This statement is to be considered as an approximation only.  We cannot be responsible for errors or omissions.

SELLER    Craig and Maria Sizer
ADDRESS 555 NE 57th St, Miami, FL  33137

SELLING PRICE                                           $ 1,375,000

METHOD OF PURCHASE  ☐ Conv. ☐ Assume ☐ FHA ☐ Owner ☐ Cash ☐ Other

State Documentary Stamps (.60/100 Dade   .70/100 Broward)  $ 8,250

Title Insurance                                           $ _____

Update prior title policy, doc prep, title fees      $ 695

FHA or VA Mortgage Discount Fee (_____ %)

Real Estate Brokerage Fee (_____ %)                 $ 82,500

Existing 1st Mortgage Balance                      $ 820,000 (approx.)

Other Existing Liens, Assessments or Mortgages   $ _____

Transaction Fee_____

Other

      **TOTAL SELLER EXPENSE**            $ 911,445

      **ESTIMATED PROCEEDS TO SELLER**      **$ 463,555**

NOTE: Adjustments to Seller's Net
1. Prorations of taxes, insurance and maintenance (where applicable).
2. Prepayment penalty (if any) on existing financing.
3. FHA and VA mortgage discount is subject to change depending on market conditions.  The above discount is based on present day mortgage market,
4. If Seller is responsible for repairs, said costs, if any, will reflect "estimated proceeds to seller".
5. Inspection fees and appraisals fees, if applicable.
6. Attorney fees (if any).
7. FIRPTA: Seller may be responsible to pay capital gains on the sale of this property. Closing agent is required to holdback 10% of sales price at closing until which time buyer satisfies the requirement of this act and receives exemption (no taxable gains)

I HAVE READ AND UNDERSTOOD THE ABOVE INFORMATION AND I UNDERSTAND THAT THIS DOES NOT REPRESENT A GUARANTEE NOR IS THIS STATEMENT TO BE CONSIDERED AS A CONTRACT.
DATE _____      SELLER _____

ASSOCIATE _____      SELLER _____

MJLyn Realty Inc. 212 NE 24th St., Miami, FL 33137 (305) 932-1771

# Exhibit 8
# (Mortgage Statement)



**RUSHMORE LOAN MANAGEMENT SERVICES**

Rushmore Loan Management Services
PO Box 52708
Irvine, CA 92619

**Visit our website at** www.rushmorelm.com
**Telephone 888-504-6700**

Statement Date: 09/12/2017

Craig V Sizer
555 NE 57th St
Miami, FL 33137-2626

27946

| | |
|---|---|
| Account Number | 7600937368 |
| Payment Due Date | 10/01/2017 |

Payments received after the statement date are not reflected.

| | |
|---|---|
| **Amount Due**(5) | **$47,927.13** |

If payment is received after 10/16/2017, a $0.00 late fee will be charged.

Rushmore Loan Management Services LLC is a Debt Collector, who is attempting to collect a debt. Any information obtained will be used for that purpose. However, if you are in Bankruptcy or received a Bankruptcy Discharge of this debt, this letter is being sent for informational purposes only, is not an attempt to collect a debt and does not constitute a notice of personal liability with respect to the debt.

## Account Information

| | |
|---|---|
| Property Address | 555  NORTHEAST 57TH STREE MIAMI FL, 33137 0000 |
| Outstanding Principal(3) | $820,000.00 |
| Deferred Balance(2) | $0.00 |
| Interest Rate (Until 5/1/2017) | 3.50000% |
| Recoverable Advances(4) | $1,374.50 |
| Prepayment Penalty | NO |

## Explanation of Amount Due(6)

| | |
|---|---|
| Principal | $0.00 |
| Interest | $2,733.33 |
| Escrow (for Taxes and Insurance) | $634.92 |
| **Regular Monthly Payment** | **$3,368.25** |
| Total Fees and Charges | $478.32 |
| Overdue Payment | $44,080.56 |
| **Total Amount Due** | **$47,927.13** |
| Partial Payment (Unapplied)(1) | $0.00 |

## Past Payments Breakdown

| | Paid Last Month | Paid Year-to-Date |
|---|---|---|
| Principal | $0.00 | $0.00 |
| Interest | $0.00 | $0.00 |
| Escrow (Taxes and Insurance) | $0.00 | $0.00 |
| Fees | $0.00 | $0.00 |
| Partial Payment (Unapplied)(1) | $0.00 | $0.00 |
| Recoverable Advances(4) | $0.00 | $0.00 |
| Total | $0.00 | $0.00 |

(1) **Partial Payment:** Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account. If you pay the balance of a partial payment, the funds will then be applied to your mortgage.

(2) **Deferred Balance:** The amount of your principal balance that is deferred as part of the terms of a loan modification.

(3) **Outstanding Principal:** This is your Loan balance only, not the payoff amount.

(4) **Recoverable Advances:** Disbursements for servicing-related expenses(non-escrow expenses) paid with servicer-funds rather than escrow funds which are recovered from you, the borrower.

(5) **Amount Due: IF YOU ARE IN FORECLOSURE OR BANKRUPTCY,** the amount listed here may not be the full amount necessary to bring your account current. To obtain the most up-to-date amount due information, please contact us at the number listed on this statement.

## If You Are Experiencing Financial Difficulty

If you would like counseling or assistance, you can contact the U.S. Department of Housing and Urban Development (HUD). For a list of homeownership counselors or counseling organizations in your area, go to http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287. **Rushmore Loan Management Services** is dedicated to providing outstanding loan servicing and customer support through a commitment to uphold ethical and honest business practices. Rushmore is customer-focused, and we treat all of our customers with respect, courtesy and integrity. We understand the importance of homeownership, and we recognize that at times economic changes can make it difficult to make your mortgage payment. We encourage our customers to contact us at **888-504-7300** to discuss assistance programs we may have available for you. We also encourage you to contact us to discuss any other issues you may be having with your mortgage. We believe that open and timely communications is a key to our relationship with you.



EQUAL HOUSING
LENDER

(Keep upper portion for your records)

Please mail so that your payment reaches us by the due date.

**Rushmore Loan Management Services**

PO Box 52708
Irvine, CA 92619

**Visit our website at** www.rushmorelm.com
**Telephone 888-504-6700**

**MORTGAGE STATEMENT**
Statement Date:  09/12/2017

Account Number:  7600937368

| | **Transaction Activity (03/01/2017 to 09/12/2017)** | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | Description | Principal | Interest | Escrow | Late Charge | Other | Total |
| 06/09 | LOAN SET-UP | -820,000.00 | | | | | |
| 06/09 | LATE CHARGE ADJUST | | | | 478.32 | | |
| 06/09 | CORP ADV ADJUSTMNT | | | | | | 1,325.00 |
| 06/27 | PROP PRESERVATION | | | | | 15.00 | 15.00 |
| 06/27 | PROP PRESERVATION | | | | | 1.50 | 1.50 |
| 07/26 | PROP PRESERVATION | | | | | 1.50 | 1.50 |
| 07/26 | PROP PRESERVATION | | | | | 15.00 | 15.00 |
| 08/24 | HAZARD INS | | | -361.97 | | | -361.97 |
| 08/24 | ESCROW ADVANCE | | | 361.97 | | | 361.97 |
| 08/25 | HAZARD INS | | | -723.94 | | | -723.94 |
| 08/25 | ESCROW ADVANCE | | | 723.94 | | | 723.94 |
| 08/29 | PROP PRESERVATION | | | | | 15.00 | 15.00 |
| 08/29 | PROP PRESERVATION | | | | | 1.50 | 1.50 |
| 09/12 | HAZARD INS | | | -361.97 | | | -361.97 |
| 09/12 | ESCROW ADVANCE | | | 361.97 | | | 361.97 |

| **\*\*Delinquency Notice\*\*** |
|---|

**You are late on your mortgage payments.**  Failure to bring your loan current may result in fees and foreclosure - the loss of your home.  As of 09/12/2017, you are 407 days delinquent on your mortgage loan, dating to 08/01/2016.

Recent Account History

| | | |
|---|---|---|
| * | Payment due 09/01/17: | Unpaid balance of $3,368.25 |
| * | Payment due 08/01/17: | Unpaid balance of $3,368.25 |
| * | Payment due 07/01/17: | Unpaid balance of $3,368.25 |
| * | Payment due 06/01/17: | Unpaid balance of $3,368.25 |
| * | Payment due 05/01/17: | Unpaid balance of $3,368.25 |
| * | Payment due 04/01/17: | Unpaid balance of $3,026.59 |
| * | Payment due 03/01/17: | Unpaid balance of $3,026.59 |
| * | Payment due 02/01/17: | Unpaid balance of $3,026.59 |
| * | Payment due 01/01/17: | Unpaid balance of $3,026.59 |
| * | Payment due 12/01/16: | Unpaid balance of $3,026.59 |
| * | Payment due 11/01/16: | Unpaid balance of $3,026.59 |
| * | Payment due 10/01/16: | Unpaid balance of $3,026.59 |
| * | **Total: $47,927.13 due.  You must pay this amount to bring your loan current.** |

**IF YOU ARE IN FORECLOSURE OR BANKRUPTCY,** the amount listed here may not be the full amount necessary to bring your account current.  To obtain the most up-to-date amount due information, please contact us at the number listed on this Statement.

| **If You Are Experiencing Financial Difficulty** |
|---|

If you would like counseling or assistance, you can contact the **U.S. Department of Housing and Urban Development (HUD)**.  For a list of homeownership counselors or counseling organizations in your area, go to **http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287**.  We also encourage you to contact **Rushmore Loan Management Services** at **888-504-7300** to discuss assistance programs we may have available for you.